# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION

**Complaint**
**(Jury Trial Demanded)**

TYLAN DELSHAUN THAXTON,
TALAISHA DAYSHAUN
THAXTON, and LATOYE ANN
BRITT,

Plaintiffs,

v.

CASWELL COUNTY SHERIFF
TONY DURDEN JR, his Official
capacities, OTIS FOSTER, Official
capacities, KEN MITCHELL in his
individual and Official capacities, and
JOHN DOE CORPORATION, in its
capacity as Surety on the Official
Bond of the Sheriff of Caswell County,

Defendants.

_____

COMES NOW the Plaintiffs, Tylan Thaxton, Talaisha Thaxton, and Latoye Britt, *Pro Se,* as Representative in the Complaint against Defendants Tony Durden Jr., in his official capacity as Sheriff of Caswell County, North Carolina. Otis Foster, in his official capacity as Administration Major of Caswell County, North Carolina, and Kenneth Mitchell, in his individual and official capacities as Lieutenant of Investigations Division, Caswell County, North Carolina. The Plaintiffs, with an unyielding resolve, are steadfast in their pursuit of justice for violating their rights.

## **PARTIES**

1.    Tylan Thaxton, plaintiff, is a citizen and resident of Caswell County, North Carolina.

2.    Talaisha Thaxton, plaintiff, is a citizen and resident of Caswell County.

1

3.     LaToye Britt, plaintiff, is a citizen and resident of Caswell County, North Carolina.

4.     Defendant County of Caswell (after this "Caswell") is a municipal corporation located in Caswell County and organized under the laws of the State of North Carolina.

5.     Caswell County Sheriff's Department, as the Defendant, bears the utmost responsibility for the policies, practices, and customs of its Sheriff Department, which are currently under scrutiny in this complaint. This legal document underlines the weight of their actions.

6.     Defendant Otis Foster, an administrative employee with the Caswell County Sheriff's Department, is being sued in his capacity as Major Operations. It is crucial to note that he acted within the scope of his employment and under the color of law at all relevant times relevant to the material incidents in this complaint, thereby amplifying the gravity of the situation.

7.     Defendant Ken Mitchell, an administration employee with the Caswell County Sheriff's Department, is being sued in his capacity as an Investigation Lieutenant. It is crucial to note that he acted within the scope of his employment and under the color of law at all relevant times relevant to the material incidents in this complaint, thereby amplifying the gravity of the situation.

8.     The CCSO office's primary duty is to safeguard lives and property and protect the innocent from becoming victims of deception and oppression while always respecting our citizens' constitutional rights.

9.     Defendant Tony Durden Jr. has been the duly elected Sheriff of Caswell County, North Carolina, since 2017.

10.     Durden has final policy-making authority for CCSO and extends to personal decisions. It is crucial to note that at all times relevant to the material incidents in this complaint, he acted within the scope of his employment and under the color of law, thereby amplifying the gravity of the situation. He's been sued in his individual and official capacities.

11.     Defendant Durden is to represent the County of Caswell with integrity and professionalism while protecting victims and their rights in pursuing justice. At all times pertinent to the material incidents in this complaint, he acted within the scope of her employment and under color of law, further emphasizing the seriousness of the situation.

12.     Defendant Joe Doe Corporation is a make-believe name for the Surety of the Official Bond of defendant Durden, Jr as Sheriff of Caswell County, according to N.C. Gen. Stat § 162-8

and § 58-76-5, whose identity is presently unknown to the plaintiff. The actual name will be made to this claim once it is revealed.

13.     Upon information and belief, the defendant is insured by one or more liability insurance policies purchased according to N.C. Gen. Stat. § 153A-435 or other applicable state law for all acts and omissions complained of herein or participated in a government risk pool according to N.C. Gen. Stat. § 58-23-5, or maintains a funded reserve. To such extent, the defendant has waived any official, sovereign, qualified, or government immunity to which he might otherwise be entitled in his official capacity.

## **JURISDICTION, VENUE, AND NOTICE**

14.     Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

15.     This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

16.     The court has jurisdiction according to 28 U.S.C. §1343(3) (civil rights) and 28 U.S.C. §1331 (federal question).

17.     This case is instituted in the United States District Court for the Middle District of North Carolina, according to 28 U.S.C. §1391, as the judicial district where all relevant events and omissions occurred and where the Defendants maintain offices or reside.

18.     Supplemental pendant jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial, and the pendant causes of action derive from a common nucleus of operative facts.

19.     This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.12.

20.     This claim also arises under the common law and the Constitution of the State of North Carolina. This Court has original jurisdiction over the plaintiff's state law claims according to 28 U.S.C. § 1367.

21.     Almost all material events giving rise to this cause of action occurred in Caswell County, North Carolina. Based on information and belief, defendant Tony Durden resided in Caswell County.

3

22.     Almost all material events giving rise to this case of action occurred in Caswell County, North Carolina. Based on information and belief, defendant Otis Foster resided in Caswell County.

23.     Almost all material events giving rise to this cause of action occurred in Caswell County, North Carolina. Based on information belief, defendant Ken Mitchell resided in Caswell County. The proper venue is the Middle District Court of North Carolina. Under 28 U.S.C. §§ 1391(b).

24.     The venue is proper in the U.S. District Court for the Middle District of North Carolina under 28 U.S.C. § 1391(b)(2) because a substantial part of the acts that gave rise to this lawsuit occurred in this judicial district. This district is also an appropriate venue under 28 U.S.C. § 1391(b)(1) because defendants reside in this judicial district.

## BACKGROUND

25.     Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

26.     Caswell County Jail was established in 1885, shortly after the formation of Caswell County in 1777. The original jail was a log cabin located in the county seat of Yanceyville. It served as the primary detention facility for the county until
the construction of a new prison in the 1960s. The Administrative Division is responsible for all data entry, sexual offender registration, gun permits, concealed weapon permits, domestic violence orders, and fingerprinting of criminal and non-criminal individuals.

27.     The Records Division maintains incident and arrest reports and assists with information for Deputies, insurance companies, and the public. The sheriff is the chief law enforcement officer of the county. *Dawson v. Radewicz and Southern Railway Co. v. Mecklenburg County*

28.     The National Sheriffs' Association is a U.S. trade association. Its stated purpose is to raise the level of professionalism among U.S. sheriffs, their deputies, and others in the fields of criminal justice and public safety.

29.     The North Carolina Sheriffs' Education and Training Standards Commission is responsible for certifying all justice officers, including deputy sheriffs, detention officers, and telecommunicators, who are employed in the 100 Sheriffs' Offices in this state, according to N.C.G.S. 17E.

30.     On his website, Defendant Sheriff Durden represents the Caswell County Sheriff's Office and believes in all people's dignity and worth. We must safeguard lives and property, protect the

4

innocent from becoming victims of deception and oppression, and always respect the constitutional rights of our citizens.

30. The Caswell County Sheriff's Office Investigations Division is responsible for criminal investigations throughout Caswell County. Generally accountable for felony investigations. The Division is a separate unit providing specialized and complex investigative techniques, including crime scene investigations. The Investigations Division encompasses the following areas: Property Crimes include, but are not limited to, felony theft, felony breaking, and fraud. Crimes against Persons include but are not limited to, kidnapping, sexual assault, homicides, robberies, and felonious assault.

31. Defendant Sheriff Durden has the full legal authority and responsibility for operating the Caswell County Sheriff's Department. Defendant Sheriff Durden delegates the responsibility for operations of the Caswell County Sheriff's Office to the Administrator of Major Operations, Defendant Otis, at all times, which is material hereto. Defendant Sheriff Durden has the full legal authority and responsibility for operating the Caswell County Sheriff's Department.

32. Defendant Sheriff Durden delegates the responsibility for operations of the Caswell County Sheriff's Office to the Administrator of Investigation Services, Defendant Mitchell, at all times, which is material hereto.

33. They were willfully Failing to Discharge the Duties of the Sheriff's Office N.C. Gen. Stat. § 14-230 makes it unlawful for a sheriff to "willfully omit, neglect or refuse to discharge any of the duties of his office."

34. N.C. Gen. Stat. § 153A-103. Number of Employees in Offices of Sheriff and Register of Deeds The text of N.C. Gen. Stat. § 153A-103- 1. Each sheriff has "the exclusive right to hire, discharge, and supervise the employees" in the sheriff's office.

35. Sheriff Durden is officially sued under G.S. 58-76-5 and G.S. 153A-435. He and his office are also sued according to the Doctrine of Respondent Superior for the actions and omissions of his Officers, employees, servants, and agents.

36. Defendant Sheriff Durden has waived any claim of sovereign immunity for himself, his deputies, servant, and employees by purchasing a surety bond according to N.C.G.S. 58-76-5 or by buying liability insurance according to N.G.S. 153A-435 or by participation in a risk management pool as authorized by statute, thereby waiving any governmental or sovereign immunity that might otherwise apply to the Sheriff or his agents in this action.

Case 1:24-cv-00535-TDS-JEP   Document 1-1   Filed 06/27/24   Page 5 of 33

37.     Defendant, Operations Major: Major Otis Foster (in the future referred to as "Defendant Foster"), to Plaintiff's information and belief, is a citizen and resident of Caswell County, North Carolina, and was at all material times employed by Sheriff Durden at the Caswell County Sheriff Office and is being named as a Defendant herein in his capacity.

38.     The surety bond and the commercial insurance or risk pool arrangement referred to in the previous paragraph waive any claim to governmental or sovereign immunity that Defendant might claim in his official capacity.

39.     Defendant, Investigation Division Administration: Lieutenant Kenneth Mitchell (in the future referred to as "Defendant Mitchell"), to Plaintiff's information and belief, is a citizen and resident of Caswell County, North Carolina, and was at all material times employed by Sheriff Durden at the Caswell County Sheriff Office and is being named as a Defendant herein in his capacity.

40.     The surety bond and the commercial insurance or risk pool arrangement referred to in the previous paragraph waive any claim to governmental or sovereign immunity that Defendant might claim in his official capacity.

## INTRODUCTION

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

41.     On his website, Defendant Sheriff Durden represents the Caswell County Sheriff's Office and believes in all people's dignity and worth. We must safeguard lives and property, protect the innocent from becoming victims of deception and oppression, and always respect the constitutional rights of our citizens.

42.     The Caswell County Sheriff's Office Investigations Division is responsible for criminal investigations throughout Caswell County. Generally accountable for felony investigations. The Division is a separate unit providing specialized and complex investigative techniques, including crime scene investigations. The Investigations Division encompasses the following areas: Property Crimes include, but are not limited to, felony theft, felony breaking, and fraud. Crimes against Persons include but are not limited to, kidnapping, sexual assault, homicides, robberies, and felonious assault.

43.     Defendant Sheriff Durden has the full legal authority and responsibility for operating the Caswell County Sheriff's Department. Defendant Sheriff Durden delegates the responsibility for operations of the Caswell County Sheriff's Office to the Administrator of Major Operations, Defendant Otis, at all times, which is material hereto.

6

44. Defendant Sheriff Durden has the full legal authority and responsibility for operating the Caswell County Sheriff's Department. Defendant Sheriff Durden delegates the responsibility for operations of the Caswell County Sheriff's Office to the Administrator of Investigation Services, Defendant Mitchell, at all times, which is material hereto.

45. The North Carolina Sheriffs' Education and Training Standards Commission is responsible for certifying all justice officers, including deputy sheriffs, detention officers, and telecommunicators, who are employed in the 100 Sheriffs' Offices in this state, according to N.C.G.S. 17E.

46. Common Law Duties and Authorities of the Office of Sheriff The common law remains in "full force and effect" in North Carolina unless legislatively changed. Thus, the sheriff's typical law duties are still the law and duties of the sheriff unless altered by statute.

47. Duties such as jail operation, law enforcement, service of process, and courts (bailiffs) existed in common law and have not been changed by statute in North Carolina. The General Statutes explicitly codify some of these duties and assume the existence of others.

48. In March 2021, Tylan Thaxton and his sister, Tashaun Thaxton, were involved in a dispute between Thaxton's sister and the girlfriend of a coworker who was said to have been in a secret relationship with Thaxton's sister.

49. TaShaun was physically working at Pelican Healthcare Nursing and Rehabilitation when she observed her co-worker's girlfriend vandalizing her vehicle.

50. The coworker's girlfriend drove to their place of employment. She physically damaged Thaxton's vehicle by throwing coffee on her windshield, kicking and spitting on the car, and using her bumper to hit TaShaun's vehicle in the parking lot. TaShaun called Tylan and told him of the incident. For about 20 minutes, both parties chased one another through Reidsville.

51. The coworker and girlfriend proceeded to head toward Caswell County, taking Highway 158 East. While they were in pursuit of one another, Tylan Thaxton stuck a gun out the window and fired 2 to 3 shots in the air.

52. Leading to an ending on US HWY 158 East; during this chase, Thaxton DID shoot into the air, while GF reported when she called 911, he shot at her vehicle while he was chasing her.

53. Shortly after the call to 911 communications, the coworker and girlfriend were pulled over by CCSO deputies. CCSO deputies spoke with them, and then they were permitted to leave. Deputies headed towards Thaxton's parked vehicles.

7

54.     As they parked and watched the deputies, their vehicles faced the opposite direction: TaShaun facing the highway and Tylan's facing the opposite direction.

55.     They were both sitting inside TaShaun's car when deputies approached it. They stated that a CCSO (Blk) approached TaShaun's vehicle, and the officer then asked for ownership of the car. Neither of the Thaxtons answered his question. The officer ran TaShaun's tag number; her name had a pick-up tag status attached to it.

56.     As the deputy was walking toward the rear of TaShaun's vehicle, he also instructed TaShaun to get out and tried to gain entry by opening the driver's side door. However, the driver's door was jammed and could not be opened.

57.     Tylan first removed himself so TaShaun could cross over to the passenger seat to gain exit from the vehicle. When she got out of the car, deputies placed her in handcuffs and searched her car, only to find an open container, which was disposed of by the officer who'd put the handcuffs on her.

58.     When asked why her vehicle was being searched, the officer replied that he had the right to do that because there was an order to pick up her license.

59.     Since neither party involved had identified their vehicles with the authorities, we assumed that it was when officers ran the tags. His sister was placed in the back of the patrol car.

60.     Thaxton was handcuffed as soon as he exited his sister's vehicle. He had been placed in the investigator's before they searched his car. Thaxton acknowledges that he did NOT permit CCSOs to search his vehicle.

61.     During the search, it was discovered Mr. Thaxton had money, weed, and a gun. Money and weed were found inside his car, while the weapon was found on the inside of his pants leg.

62.     The CCSO conducted a gunpowder residue test at the scene. Did indeed give Thaxton a gunpowder residue test at the scene of the incident. This is very important for future actions of the CCSO gunpowder residue test.

63.     Thaxton was placed into custody and taken to CCSO for processing. We waited for him to be given a bond for almost four hours. As a result of the lengthy time frame, it was brought to our attention that CCSO officers were trying to process Mr. Thaxton with charges that were inexcusable to the magistrate on duty.

64.     After waiting five hours or more, Mr. Thaxton was finally given a secured bond of $5,000. Upon his release, items retrieved during the search were kept from Mr. Thaxton.

65.    However, he was able to provide documentation to account for the amount of money recovered during the search. Those funds weren't returned.

66.    Mr. Thaxton accepted the plea for the gun instead of the drugs, and we believe that after receiving this plea and learning the severity of the situation, Thaxton felt as if the CCSO was harassing him.

67.    The defendant's actions were done maliciously, willfully, wantonly, or in a manner that demonstrates reckless disregard for Thaxton's and Britt's rights. As a result of the defendant's conduct, the plaintiff is entitled to recover punitive damages. As a proximate result of the defendant's wrongful conduct, Thaxton and Britt have suffered emotional distress, humiliation, loss of reputation, and other damages.

68.    The defendant's actions were maliciously, willfully, wantonly, or in a manner that demonstrates reckless disregard for the plaintiff's rights by canvasing the plaintiff's property without permission.

69.    The North Carolina Constitution protected the plaintiff's freedom. There was no legitimate, non-discriminatory reason for CCSO deputies to canvas a citizen's property without prior authorization.

70.    The concerns expressed by the plaintiff on more than one occasion were regarding unethical practices, personal feelings, vendetta, and misconduct shown toward the plaintiffs.

**FIRST CAUSE OF ACTION:**

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

71.    May 15-25, 2022: The first initial visit to my residence was without probable cause. When deputies arrived, no one announced themselves as CCSO, and no one came to knock at the door. Deputies could be observed writing down license plate information for parked vehicles at the residence.

72.    Deputies were observed walking around the plaintiff's property. Deputies walked to the back of the property, where the utility building is located. While deputies were at the rear of the property, they could be observed looking through the windows of the plaintiff's utility building. One deputy attempted to open the utility door until another deputy stopped him.

9

73.     During the times in question, deputies were unaware someone was inside the residence; they were being watched from inside the residence. After deputies proceeded to walk around and record information, they knocked on the door; when the person inside the residence answered the door, CCSO was asked, "Why were they walking around the property without someone knowing they were out there?"

74.     Deputies were not expecting someone to answer the knock; once the person inside opened the door and asked "why they were freely walking the property without first speaking with someone," deputies at that moment asked if Tylan was home.

75.     Deputies were asked again," Why were they walking around the property without speaking with someone or knocking on the door first?" At this point, deputies became rude and started harassing the person inside, asking questions regarding the vehicles and a dirt bike leaning against a pole on the side of the plaintiff's deck.

76.     Deputies were interested in the dirt bike at the front of the property. During the word exchange, the person on the inside expressed several times that he was not the homeowner and could not speak with them. He asked again why they walked around the property without announcing themselves when they first entered.

77.     Deputies were unaware that the homeowner, Ms. Britt, could listen to the events happening at the residence during this time as she was video chatting with someone inside the home.

78.     Ms. Britt could hear deputies tell the person to "make sure the dirt bike doesn't move." "make sure that dirt bike stays there until we come back."

79.     Ms. Britt could hear deputies tell the person, "Shouldn't be answering doors if he doesn't live there."

80.     While Ms. Britt was on the video call, deputies were unaware that Ms. Britt could hear them and that they were rude and disrespectful to the person inside her home.

81.     Since Ms. Britt was absent, she called her daughter, Akia Mills, to pick her up and bring her to the residence. In transit to the home, Ms. Britt called the CCSO non-emergency line several times to complain about the deputies' unethical behaviors while on the property.

82.     While on the phone, Ms. Britt continuously asked the sheriff's department for those same officers to return to the residence and asked for the names and badge numbers of the deputies involved in the incident.

83.     Ms. Britt expressed several times the wrongdoing of the deputies on her property without her presence. Ms. Britt said it was wrong for deputies to treat and speak to the guests at her home rudely and discourteously.

84.     Ms. Britt expressed her horror at deputies threatening the person at her house, telling her not to move the dirt bike from its location as they would be coming back for it.

85.     Due to the events, Ms. Britt called and left several messages for someone to explain why those officers conducted themselves as they did. Ms. Britt called CCSO several times to speak with someone about the deputies' misconduct at the residence.

86.     Ms. Britt spoke with Capt. Loftis concerning the matter. Capt. Loftis also expressed his concern about how deputies may have handled the situation differently than the way they did.

87.     During Ms. Britt's conversation with Capt. Lotfis, Loftis, told Ms. Britt, "He was going to see about some type of classes or something similar." At that time, I was informed that K. Roberts would be the detective on the cause, and I needed to refer all questions to him because he was the lead detective on the case.

88.     As informed, Ms. Britt has yet to speak with K. Roberts concerning the matter from the day of the incident until this Complaint. At that moment, the conversation ended because Ms. Britt was told to wait until K. Roberts contacted her.

89.     Ms. Britt called several more days later, inquiring about the same information. When Ms. Britt asked about it, Ms. Britt was told, "Someone else would be handling the matter. K. Roberts was unavailable; he had a family emergency.

90.     Ms. Britt, at the time of this Complaint, still has not spoken with K. Roberts concerning the misconduct of CCSO deputies when they were at Ms. Britt's residence.

91.     At the time of this Complaint, Ms. Britt will compare the search warrant issues at the residence on two separate incidents, essential and referenced in the Jan. 23rd and 24th, 2023 incidents.

**SECOND CAUSE FOR ACTION:**

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

92.     On or about May 22nd-23rd of 2022, Ms. Britt received a call from Lt. Callhaun. Lt. Callhaun connected with Ms. Britt, asking if she was home.

11

93.     Lt. Callhaun asked Ms. Britt if she could meet CCSO at the residence. They had a search warrant for Ms. Britt's utility building at the back of the home.

94.     Lt. Callhaun stated, "He wanted to call me so I could be there because he did NOT want an incident like before." I agreed to come and give permission for CCSO to search the utility building Located at the back of the home.

95.     When Ms. Britt arrived, she was greeted by Lt. Callhaun. Lt. Callhaun explained to Ms. Britt that Lt. Mitchell would be conducting the search and handling the case.

96.     When Ms. Britt inquired why K. Roberts was no longer involved in this case matter. She was told the case was handed off to Lt. Mitchell.

97.     Lt. Mitchell and deputies were at Ms. Britt's residence for over four hours in the utility building, trying to determine whether the dirt bikes inside the building were the bikes they were searching for.

98.     During the building search, Ms. Britt told Lt. Mitchell where the stolen dirt bikes could be located; Ms. Britt also provided Lt. Mitchell with the names of the individuals who had possession of the stolen bikes at the time of the search.

99.     The information provided by Ms. Britt to CCSO's Lt. Mitchell on the day of the search was not investigated.

100.    Ms. Britt states that at the time of this complaint, the information given on the day of the search still needs to be investigated. As to Ms. Britt's understanding, there have been more reports of stolen dirt bikes in the area after this incident.

101.    Lt. Mitchell was still looking at the photos to see if this was the dirt bike they were searching for. After thirty to forty minutes of Lt. Mitchell examining photos, Ms. Britt called Tylan Thaxton via video chat via Facebook messenger.

102.    Tylan explained over the phone to Lt. Mitchell where his parts come from and provided receipts for when someone purchased another dirt bike for him and where he brought all types of accessories and gear. CCSO's Lt. Mitchell and deputies knew this before leaving the residence.

103.    During the search, Lt. Mitchell kept glancing and messing with his phone. When Ms. Britt asked why the search took so long, Lt. Mitchell, the lead detective, stated that he was trying to communicate with the victim. He was unsure if this was the correct bike and whether either bike in Ms. Britt's building was the bike in question.

12

104.   Once, Lt. Mitchell said he was trying to ask the victim if this was the right bike, but he could not send messages due to an insufficient signal. At Ms. Britt's residence, a Wi-Fi signal is needed to communicate and use cellular devices.

105.   Ms. Britt informed Lt. Mitchell of the signal information and offered to take Lt. Mitchell's phone and connect it to the Wi-Fi.

106.   Lt. Mitchell stated he could not give me the victim's phone. Although Lt. Mitchell stated he could not provide Ms. Britt with the victim's phone, Lt. Mitchell still proceeded to give Ms. Britt the victim's phone.

107.   At this time, Ms. Britt took possession of the victim's phone from Lt. Mitchell. Ms. Britt walked to the back of the home, went up the steps, and entered the back door into her kitchen.

108.   As Ms. Britt connected the victim's phone to the Wi-fi, Ms. Britt could see the phone number associated with the phone.  While Ms. Britt had the victim's phone in her possession, she did not look through the device.

109.   Ms. Britt turned around and walked back out the door and down the steps. Once outside, Ms. Britt returned the victim's phone to Lt. Mitchell.

110.   Lt. Mitchell then proceeded to go back into the building. At this time, Ms. Britt left the back of the home where the search was being conducted, went inside the residence, and video-called Tylan Thaxton again.

111.   While on the video call with Tylan, Ms. Britt gave him the number she remembered from when she had the phone from Lt. Mitchell.

112.   During the conversation with Tylan, he told Ms. Britt to enter the number into the Cash app, which would reveal who the number was registered to.

113.   Ms. Britt and Tylan Thaxon could determine that Lt. Mitchell and the victim were related. Ms. Britt stated that the Cash App revealed that the phone was registered with Jayden Mitchell.

114.   Ms. Britt states Lt. Mitchell's involvement in the case causes a conflict of interest. Lt. Mitchell is related to the individual, Jayden Mitchell.

Case 1:24-cv-00535-TDS-JEP   Document 1-1   Filed 06/27/24   Page 13 of 33

115.    Ms. Britt states that once she received this information, she returned to the search being conducted and told Lt. Mitchell that if they were not going to take anything from her home, they needed to leave the premises.

## THIRD CAUSE OF ACTION:

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

116.    Ms. Britt says that before deputies came to her residence with the search warrant, which happened around the same time, CCSO deputies came to Ms. Britt's residence for nonsense calls and the harassment of Tylan Thaxton. All the while, CCSO deputies canvassed the property.

117.    Days before the search, Tylan rode his dirt bike on Mineral Springs Road. While riding, he observed a vehicle following behind him, driving at an unusual speed. After Tylan noticed the car, he could begin to ride alongside it. Tylan observed Lt. Mitchell, a female occupant, and someone seated in the back of the rental vehicle.

118.    Ms. Britt submitted a Complaint to the CCSO, Sheriff Tony Durden, regarding this incident and was able to provide photos of the same dirt bike, which Lt. Mitchell stated was stolen.

119.    Ms. Britt states that at the time of his Complaint, the CCSO had not contacted Ms. Britt or Tylan and Talaisha Thaxton regarding the contents of the Complaint.

120.    Ms. Britt states that within the next few days of Tylan riding alongside the rented vehicle, two friends of Jayden visited Ms. Britt's residence. In return, Jayden's friends told Jayden his dirt bike was at Tylan Thaxton's house.

121.    Officers walked around my property the next day, slightly jarring my shed door open to look in. The officers did not know someone was in my house looking at them through the back window.

122.    Officers were bullying my guest and repeating to him, "Make sure that dirt bike stays right there. You're going to jail, buddy". This is when I called about how they conducted themselves and why they did NOT wait until I got to the residence. That call should be recorded as well.

14

123.    Jayden Mitchell's paying and offering to pay individuals for the address, communicating threats through social media, and being related to the leading investigator create many conflicts of interest.

124.    Ms. Britt states she has text messages and social media posts from Jayden's friends, proof that Jayden Mitchell offered to pay an individual for Ms. Britt's address.

125.    Ms. Britt states she has text messages and social media posts from Jayden's friends, proof that Jayden Mitchell paid an individual for Ms. Britt's address.

## FOURTH CAUSE OF ACTION:

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

126.    Ms. Britt states that in the months leading to the January 23rd, 2023, incident, CCSO has been to her residence at least ten to twelve times in response to the neighbor, Anita Graves, repeatedly calling CCSO complaining of Ms. Britt's kids running through and on her property.

127.    Ms. Britt states that in the months leading to the January 23rd, 2023, incident. CCSO has been to her residence at least ten to twelve times in response to the neighbor, Anita Graves, repeatedly calling CCSO and complaining of Ms. Britt's kids riding their dirt bikes through and on her property.

128.    Ms. Britt states that in the months leading to the January 23rd, 2023, incident. CCSO has been to her residence at least ten to twelve times in response to the neighbor,

129.    Anita Graves called CCSO complaining of Ms. Britt's kids running through and shooting on her property.

130.    Ms. Britt states the following concerns and issues described below were addressed in a complaint previously submitted to the CCSO.

131.    Ms. Britt states she has not been given any information regarding the complaint against Sheriff Durden, Major O. Foster, and Lt. Mitchell, submitted in late 2023.

132.    Ms. Britt stated her complaint against Sheriff Durden, Major O. Foster, and Lt. Mitchell, submitted in 2023 to CCSO the following:

133.    Ms. Britt's residence was shot into, and her home was shot into by the same individuals she'd previously identified to Lt. Mitchell during the day of the search in May in the hot weather.

15

134.     Ms. Britt called CCSO to complain about the neighbor, who at the time lived across from Sheriff Durden on Mineral Springs Road. The neighbor physically came to Ms. Britt's residence, communicating threats to kill one of her dogs due to one of his pits being killed. No one from the CCSO came to investigate the matter.

135.     On the day the first neighbor threatened Ms. Britt, she went to a second neighbor's home. This neighbor does live behind Sheriff Tony Durden.

136.     Ms. Britt went to the second neighbor's home because, at the time, this neighbor had a black dog named Big Boy, who belonged to the neighbor's sister and lived across the road from the Sheriff.

137.     Ms. Britt only knew this information about Big Boy's owner because she and the neighbor had spoken before when Big Boy first started coming to Ms. Britt's home.

138.     Ms. Britt went to the second neighbor's home to inform him of the first neighbor's intentions of saying he was going to shoot the dogs.

139.     Ms. Britt had called several times before the first neighbors commented on killing the dogs. Ms. Britt called CCSO and the animal shelter to discuss the treatment of the animals, especially during the summer months. Ms. Britt complained about the dogs not being fed and not being provided water during the summer.

140.     Ms. Britt had called several times before the first neighbors commented on killing the dogs. Ms. Britt called CCSO and the animal shelter to discuss the treatment of the animals, especially during the summer months.

141.     Ms. Britt complained about the location of the training and fighting equipment with the animals and about their lack of protection in the winter.

142.     No one from CCSO, Ms. Britt, ever came to check Ms. Britt's complaints. At the end of this incident, Ms. Britt's pit bull and Shih Tzu were shot by the first neighbor.

## FIFTH CAUSE OF ACTION:

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

153. In January, Ms. Britt wrote to Sheriff Durden: "January 23, 2023: I'm genuinely not trying to be one of those parents trying to seek justice after the fact- it's my discretion that CCSO conducted some of these procedures unethically.

154. Things like coming onto my property without announcing themselves could have been deadly. They would not know someone was inside the residence and would freely walk around on someone's property without permission or any indication of why they were there.

155. My location was 11 miles and 15 minutes from 691 Mineral Springs Rd. Tylan picked me up around 2:20-2:30 p.m. We returned around 4:45 p.m.

156. I'm optimistic about this time. I need to confirm an appointment time for the following day. My phone was off, and I needed Tylan to call the doctor to confirm the time.

157. When he helped me in the house, I looked at my calendar, where I thought I had written it down, but I did not. I asked what time it was. We both looked and saw that it was 4:45 p.m. I told my son there was still enough time for him to call them for me, get confirmation, and text me back through the Wi-Fi.

158. At 5:45 p.m., Tylan texted me asking if I could help him pay a bill. I replied to Him at 5:53 p.m. After this, I didn't contact Him again until 9:36 p.m. According to the Caswell County news release, this happened at 7:30 p.m.

159. The reported CCSO time is off, according to the CCSO news release. Suspect Thomas, on the night in question, left the scene, returned to the scene, and began to shoot on Mineral Springs Road.

160. Suspect Thomas alleged the home on Mineral Springs Road, where shots were fired at the house located on Mineral Springs Road, the home of Anita Graves, thinking it was the home of Mr. Thaxton.

161. On this same night, the shooting occurred. Suspect Thomas is believed to have driven to Raleigh-Durham International Airport for a flight departing RDU and arriving at LAX. This same night, J.T. left the scene, came back, and shot up the Graves residence, thinking it was ours. I proceeded to RDU to catch a flight to LAX the same night. This is the baseline for this situation.

162. Both Thaxtons can give more in-depth details from that night. I have the following information on what happened that night: January 23, 2023. Those detained were K'Shawn Farrish (17), Ace (19), and Sosa (20).

163.    The only one I knew to be there was K. Farrish. So here's the storyline from earlier in the day leading up to 9:36 p.m. At 9:36 p.m., Tylan didn't answer his phone, so I called his sister.

164.    That call was at 9:38 p.m. When I spoke with Talaisha, I asked her what she was doing. She told me she was in the kitchen washing dishes, and they were cleaning up.

165.    So I asked who was there, who were they? Talaisha said it was her, one of my granddaughters, and another female (between ages 15 and 17). I asked her who was there twice, and she repeated the same.

166.    I asked her if the police were there because I had received a call that they were hiding in the woods behind my house. My daughter advised me that there weren't any police at my house then.

167.    9:26 pm-I received a call about the Caswell County Sheriff dept. I had surrounded my residence from 9:36-38 pm- where I stated above, where I called my daughter-also during this time, after hanging up with my daughter, I called my son to see where he was to tell him about the phone call.

168.    I needed him to go home to check on his sister (she was pregnant). At 10:30 pm, I received a text from my son asking me to call him. During this call, we tried to figure out what had happened and why the sheriff had surrounded my home.

169.    I got off the phone with my son at that time. The next call I received was from my daughter at 11:37 pm.

170.    At 11:37 p.m., deputies arrived at my residence. When I answered the phone, she was yelling, and they bum-rushed down my driveway to my front door, about 5 to 7 police cars 2.

171.    During this call, I spoke with Chief Foster. I asked him why they were at my residence. He first told me the scent of gunpowder led them to my residence.

172.    He also told me they were looking for three individuals involved in a shooting on Mineral Springs Road. This is when I told him I was tired of everything in that area; it always had to be my son.

173.    I told them I was tired of them coming to my residence for my son. I told him they shouldn't be there and that my son had nothing to do with what had happened.

174. During this call, he advised me that they would stay on my property until they received a search warrant, and my reply was that it was late and that I needed to come out to permit them to search my residence.

175. It was later revealed to my son & me that an ex-employee of CCSO stated that Durden permitted them that night to enter my residence due to the continuous harassment calls being placed by our neighbor Anita Graves.

176. When I visited Durden the following day, he assured me this search was performed correctly.

177. My daughter repeated every word, so they knew I was not coming to permit them. (The search warrant and permission are due to an issue with another case; I will explain the comparison at that point).

178. I also told him not to get the castings already in my yard confused with the casting from this shooting. While being detained, she experienced unnecessary roughness (she's pregnant).

179. Also, while being detained, she explained and expressed how her body was exposed because there were male officers in her presence, and she was naked.

180. When I mentioned this situation to Durden as a concern, he responded, "He didn't care what happened as long as there was a female officer present."

181. My daughter's body was fully uncovered-she had just taken a shower. (Durden, when I mentioned this the following day, he told me it was none of his concern as long as a female officer was present.

182. Everyone in my household was detained that night by CCSO. This shooting involved three individuals I did not know of by the neighbors calling and reporting my son shot up their home.

183. Which indeed prompted CCSO to visit my residence once again. Three of the individuals were later found and eventually charged with shooting inside an occupied dwelling from the guns in the safe that was located in the residence.

184. Two weeks later, CCSO came back with warrants for both of the Thaxton twins for felony possession of a stolen firearm.

185. CCSO did a news break with my home when neighbors said that Tylan and the small boys were the ones that shot up their house and ran back into the woods towards my residence.

186. It was very embarrassing, considering all parties were detained, none of which was Tylan. At that moment, I wasn't aware that three individuals had been found in my residence.

187. It wasn't until the following morning, when I canceled my doctor's appointment to go to the sheriff's office to speak with the Sheriff about the prior night's events, that I found out about the three young men."

188. Gunpowder Residue Testing Onsite During the residence search, CCSO detained three individuals who were considered suspects in this shooting.

189. These three individuals who were in custody never gave a gun residue testing on the spot. vs. when my son was accused of shooting while he was driving, he did admit to firing in the air, not at the vehicle.

190. Driving on the highway- he was charged; he had a gun, but he was given the gun residue testing on the spot. Why wasn't this handled in the same fashion as March 2021? The residence was surrounded by law enforcement. No one administered the gunpowder residue testing.

191. Per the search warrant, they were looking for any evidence leading to or associated with shooting into an occupied dwelling. Once receiving the warrant, my daughter told me how the deputies unlawfully entered my residence.

192. As a guest at my residence, a 16-17-year-old African American female was greeted by a deputy of CCSO.

193. The deputy had already assisted himself in entering my residence without executing the search warrant for the homeowner or announcing himself the correct way.

194. (Through their admission, they stated they didn't want a situation like the last one regarding the search warrant but didn't follow the same protocol this time.)

195. I knew the last known disagreement with the Graves was around the second to the third week of January. Mr. and Mrs. Graves have had problems with my children before, as they told the deputies on occasion. Mr. and Mrs. Graves said, "It was my son shooting at their residence."

196. They called because he was riding his dirt bike through the path. This elderly couple called the police on my son because he was riding his dirt bike, so there's history.

197.    I have also enclosed a copy of my property lines. They reported shots fired, and the report said she was in her bedroom.

198.    When I met with the chief and the sheriff the following morning, he stated that " they were in the living room, and bullets went right by their heads."

199.    She ran and looked out her back door and saw the individuals running toward my residence.

200.    One of the most important things mentioned while in their presence was why they blamed my son.

201.    My son wasn't even present, nor was he one of the three detained when they had a news break airing cops surrounding my residence with an active shooter.

202.    May I add three hours after the shooting? CCSO said approximately 7:30 p.m., but that time frame isn't correct. This occurred between 6 pm and 6:45 pm.

203.    There's an individual who spends a lot of time in my woods located in the back of the residence, and this is mainly because when I called for patrol about the neighbor who keeps his dogs at his grandmother's home on a piece of my property, no one ever responded to my complaints.

204.    This is how we can know about some of the behaviors displayed by CCSOs. All of the shooters have been apprehended. None of the three individuals was my son. Tylan DelShaun Thaxton wasn't responsible for the shooting, as they were proclaiming, as Tylan and I were together.

205.    I have mailed copies of this information to the local Law Enforcement Officials, CCSO, the Civil Rights Department, and the Department of Justice.

### **SIXTH CAUSE OF ACTION:**

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

206.    Failure to Intervene: an officer who purposefully allows a fellow officer to violate a victim's constitutional right may be prosecuted for failure to intervene to stop the constitutional violation.

21

207. To prosecute such an officer, the government must show that the defendant officer was aware of the constitutional violation, had an opportunity to intervene, and chose not to do so.

208. This charge is often appropriate for supervisory officers who observe uses of excessive force without stopping them or actively encourage uses of excessive force but do not directly participate in them.

209. Major O. Foster allowed Durden to use an excessive tone of voice for almost two minutes as he stood up and spoke very loudly to get my house in order and for me to leave his office.

210. I listened and observed Durden become verbally abusive during the conversation because I disagreed with my son being responsible. As I described, he became more outraged when I said you blamed this on my son.

211. Observing how Durden allowed his emotions & feelings to become involved with this case because he was going after the charge of attempted murder of his neighbors.

212. Observing Durden's behavior toward me, his attitude, temperament, demeanor, and personal feelings, Foster never interrupted until Durden stood up yelling at me, telling me to clean my house and get my house in order while telling me to get out of his office.

213. I was not wanted for questioning. I went to the sheriff's department seeking answers about the night before events. I went there to inquire about my residence because I-We feel like our rights have been violated.

214. I told Durden I would have my son call CCSO with the information he knew about this incident, which my son did. I told Durden I would NOT bring him there for them to arrest him. I'd have him call them, and that's what we did.

215. Our actions and behaviors are based on the fact that we feel Tylan is a victim of a pattern or practice for these law officials in Caswell County.

216. Due to the strength of our family, we're there for one another as a family. If it were not for us, CCSO would have never caught those shooters, especially the one from Reidsville.

217. I feel it's a shame I must and need to take these measures to protect my son due to the rumors of his reputation among the neighbors, the sheriff, and the officers. He's only been convicted of one charge.

218.  I honestly, once again, don't want to be another African-American female begging for justice for my son or burying him at anyone's expense. Tyan absconded for almost (1) a year and a half, and Tony Durden stayed across the street from us.

219.  Sheriff has told me several times before how he's spoken with Tylan about the shooting on our property.

220.  The sheriff has also been to the residence to talk with Tylan about the dirt bikes riding due to a conflict with the neighbors (neighbors of us both) for being on their property when. Indeed, it's still my property line that she states belongs to her.

221.  The point of all this is that if Tylan was wanted and committed all these crimes, why was it so hard for law enforcement to get him, and he was right across the street the whole time?

222.  Current pending charges: Ty'Lan D' Thaxton Caswell & Rockingham Counties: Case Number: 22CR050196 Felony-Breaking and Entering, Felony, Larceny after Breaking; Month and Year-May 2022-Caswell County Issues: False Arrest—False arrest involves illegal searches and seizures, which are protected by the Fourth Amendment and controlled by the Constitution. An officer can be proven responsible in a police brutality lawsuit if they lack probable cause to believe that the accused had committed a crime or was in the process of committing a crime.

223.  Conflict of interest- Investigating Detective Lt. Mitchell relates to the victim Jayden Mitchell as a parent, grandparent, aunt/uncle, or cousin. Investigator Mitchell provided the victim's phone to the house owner while searching a utility building at 691 Mineral Springs Road in Pelham, NC.

224.  The cell phone number was recognized as Jayden Mitchell's. Jayden Mitchell and Ty'Lan Thaxton had completed business transactions in the past.

225.  Investigating Detective Lt. Mitchell, a female occupant, and Jayden Mitchell were seen in Mineral Springs looking for Thaxton's physical address. This conversation can be verified.

226.  Jayden Mitchell contacted a friend of his and Thaxton's via text message. Jayden Mitchell texted for this information in cash to retrieve Thaxton's physical address. It can also be verified that Jayden Mitchell offered payment for this information in the form of money.

227.  Investigating Detective Lt. Mitchell was observed by Thaxton on Mineral Springs while riding alongside the vehicle on another ATV before executing the search warrant in May of 2022.

23

228.   It can be verified that CCSO deputies visited Thaxton's home a few days before being served a search warrant for the outside utility building.

229.   These five to six deputies were present during this visit. A family member inside the home observed the actions and behaviors of CCSO deputies: deputies did not announce themselves when first coming onto the property and did not knock on the door to see if anyone was inside the home.

230.   CCSO deputies searched the property without a warrant, took pictures, and wrote down vehicle information.

231.   Deputies were also observed walking to the rear portion of the property and looking into the utility building.

232.   One deputy is observed opening the door of the utility building, one deputy is observed looking into the windows of the utility building, and one deputy is observed walking behind the utility building.

233.   The utility building, a potential site of interest in this case, has never been locked as long as it has been located in the rear of the property. As the deputies
They were observed returning to the front of the property and by a family member inside the home.

234.   Once CCSO deputies noticed him, they became aggressive, harassed him, and were very disrespectful and rude. A complaint was made on behalf of these deputies regarding their actions and behaviors that day.

235.   The homeowner called the CCSO several times, complaining about the treatment given by the deputies, threatening comments made by the deputies, and the unethical practices of the deputies on that day. Singling out a dirt bike prompt on the side of the deck, one officer stated, "Make sure this dirt bike is here when we come back."

236.   After several calls by the homeowner requesting those same officers return to the residence, complaints ranged from not announcing themselves once they were on the property to the unethical practices seen performed (deputies were unaware a person was inside the residence) and being caught on surveillance video surrounding the property.

237.   Around 1:30 p.m., the homeowner received a call from CCSO apologizing for the deputies' actions and behaviors. This call was placed by either Callhaun or Logan.

238.    During this conversation, she was advised that a detective named Keith or Kevin Roberts would handle this report and contact me later to answer any questions concerning the incident.

239.    While holding this conversation, the homeowner was asked what she would like to see happen with these officers, and it was explained how dangerous it was for the deputies to walk around someone else's property freely. This could have been a severe issue. Someone could have died because the deputies just felt comfortable walking around someone else's property, canvassing the property unlawfully.

240.    The homeowner stated that these deputies might need to return for a refresher course in basic training or an educational course to perform. However, the homeowner was merely stating her opinion. The bottom line she wanted to express was these deputies' unethical practices in May 2022.

241.    A few days later, the homeowner called CCSO, hoping to speak with the investigating detective. At this time, it was stated he wasn't available to talk with the homeowner due to having an emergency. The homeowner was told to return a call the following week.

242.    On a second attempt the following week, believed to be Monday morning, the homeowner called CCSO in hopes of speaking with the investigating detective. During this conversation, the homeowner was told that this detective could not reach her due to illness.

243.    Later in the week, Lt. Callhaun of CCSO contacted the homeowner. Lt. Callhaun explained there was a search warrant for the utility building on the property. Could she come to the residence so they could execute the warrant? He stated, "He wanted to know how long it would take her to get there."

244.    He was providing a call because he did not like the same situation as before, but it was agreed upon as she headed to the property. When arriving, the homeowner was introduced to Lt. Mitchell, who was now investigating this case.

245.    The homeowner asked about what happened with the detective assigned to the case. At this time, it was stated again that Roberts was out due to an illness. Lt. Callhaun left the property, and Lt. Mitchell started to search the building.

246.    He explained what he was looking for, as they had been on the property for at least three hours. Mitchell did not have an identification from the victim stating that it was indeed the bike. Lt. Mitchell spoke with Thaxton via Facebook.

247.    Thaxton was listed as an absconder for probation violation. Lt. Mitchell stated, "I know he (Thaxton) has other things going on with the law, but if you could get him on the phone, that would be great."

248.    Before contacting Thaxton, the homeowner called his daughter's mother to verify that she had just purchased a bike for Thaxton. He provided receipts for the motorcycle, parts, and accessories and showed them to Mitchell while searching.

248.    Lt. Mitchell also spoke with Thaxton's daughter's mother, who told Lt. Mitchell, "She purchased the bike and drove to the location to retrieve it. Thaxton provided information about how he obtained such items and receipts showing where he bought them 250.        Thaxton provided each person and place where any dealings were made regarding any dirt bike on the property. As others on the property observed, we believe Lt. Mitchell wasn't concerned with those receipts.

249.    Lt. Mitchell was still determining if this was indeed the correct dirt bike. Lt. Mitchell decided this was the correct bike due to a particular cutting located on the riding seat of the bike.

250.    But they should have disclosed that two other seats were cut like the one he retrieved. Those seats were also present inside the building but were not taken in as evidence in the matter.

251.    Investigating Detective Lt. Mitchell removed a dirt bike from the property, still unsure whether or not this was indeed the dirt bike in question of the crime.

252.    He stated, "If this were not the bike, he would return the bike. Since this time, the bike has been sold.

253.    He was improperly investigating the thief of his relatives' property. As stated above, the victim, Jayden Mitchell, is somehow related to Lt. Mitchell by either cousin, father, grandfather, or uncle. As of November 6, 2023, this matter still needs to be resolved.

254.    The statement from one of the individuals detained on January 23, 2023, is also provided. Since then, he has been on an electronic monitor, and there is no reason for such monitoring for his release in this matter.

255.    After several court appearances, this still hasn't been resolved. K. Farrish. Sheriff Durden has tried to communicate with Ms. Thaxton, sister, knowing she has an attorney.

256.    She was approached during the first appearance, which was reported to her attorney. Her attorney stated she needed proof that this would be a he-say/she-say situation.

257. As you will read the information provided, Sheriff Durden used various methods of communication to speak with Ms. Thaxton about this situation.

258. Deputies searching for information about an attempted murder suspect in Caswell Co. The Caswell County Sheriff's Office is looking for the person or people responsible for firing shots into a home on Mineral Springs Road.

259. On January 23, 2023, the Caswell County Sheriff's Office responded to a call of shots fired into an occupied dwelling on Mineral Springs Road in the Pelham community. Anyone with any information on this incident is asked to contact the Sheriff's Office at 33-694-2555 or the Caswell County Crime Stopper at 336-694-5199.

260. Firearm Suspect Arrested: Caswell County Sheriff's Office- Pelham, NC. Plaintiff Tylan Thaxton was arrested and charged with a FELONIOUS criminal offense (1) count of POSSESSION OF A STOLEN FIREARM. He was placed in Caswell County Detention Center under a $ 50,000 SECURED BOND. His first appearance in Caswell District Court is scheduled for Wednesday, February 22nd, 2023, at 9:00 am.

261. Ta'Laisha D. Thaxton Caswell County-12/13/2023 Case Number: 23CR00031 C5179189-Misdemeanor-RESISTING PUBLIC OFFICER Case Number: 23CR225372 Felony-POSSESS STOLEN FIREARM On Jan. 23rd, our home located at 691 Mineral Springs Road in Pelham, NC was searched by CCSO about a drive-by shooting.

262. During this search, each party in the residence was detained by CCSO while being detained, and no one was given any residue testing, nor was anyone arrested. A safe was removed from the residence.

263. Upon entry to the safe, two weapons were recovered. About 2 to 3 weeks later, Kashawn Farrish (my child's father) was charged with a shooting crime related to this incident.

264. The CCSO detained Farrish from her residence, stating there was a juvenile petition to bring him into custody. However, the CCSO did not provide an arrest warrant to detain Mr. Farrish.

265. He was detained from February 3rd until March 3rd. Without providing any paperwork for his detention, his probation officer was not informed that he was in custody, and they attempted to question him without a parent present.

266. On March 3rd, Farrish was sent home with the home monitoring device. Farrish's first appearance was toward the end of March, and I was present with him at this appearance.

267.    During this appearance, Durden approached me. He said, "I know you didn't have anything to do with this, but we charged you because you live there." I told him, "I have an attorney and can't talk to you without his presence." After this, I contacted my attorney to inform him.

268.    Despite his knowledge of my legal representation, Durden's persistent attempts to communicate with me are a matter of concern. He was even present for my first court appearance.

269.    After speaking with the attorney, I was informed that this was mostly his word against mine type of situation. If he were to put Durden on the stand, this would be his first encounter with him since being charged with felony possession of a stolen firearm, and my twin was accused of the same crime.

270.    On Aug. 10th, 2023. I was in Food Lion around 6:45 pm-7:00 pm. I was standing on the candy aisle looking for "original" Hot-Chews. Durden came on the aisle as well.

271.    He saw me and said, "Hey, how are you?" "I said I'm good, how about you?" Then he said, "Oh,  you already had the baby?" "I said, yes, I had him six weeks ago." This was the end of the conversation.

272.    Durden walked away and asked the person stocking where he could find a Sprite with no caffeine. The stocker told him the next aisle, and Durden left the aisle. I was walking up to come off the aisle when my phone rang. It was my sister who was asking me what I was doing. "I said to the food lion, looking for some "original" Hot-Chews 'cause they are hard to find.

273.    We were talking, and I told her, "Tomorrow I have to go to the courthouse and get a package for Mama," she asked me, what kind of? "I stated I don't know, it's just a package. I will ask her tomorrow again what kind before I go," I was still on the phone walking up the aisle, again I was greeted by Sheriff Durden.

274.    Sheriff Durden told me, "You must go to the police department tomorrow." I said, "Yes, I have to pick up a packet for my mom." He said, "Well, can you meet me at my office at 1 p.m.?" I said, "Yes, but I have an attorney." I agreed to meet with him so he could stop talking to me.

275.    Before leaving Food Lion, I inboxed my mother and inboxed in our family group chat, as we all still said he spoke with you. Like before, my mother told me to write down the date, day, and time of anything dealing with CCSO.

276. After a prior conversation with Sheriff Durden, Ms. Thaxton agreed to meet Sheriff Durden at the CCSO on August 11th, 2023.

277. CCSO on August 11th, 2023. I did not meet with Sheriff Durden on the specified date and time, as I'd previously agreed to. I did not meet with the Sheriff at the agreed-upon time. As a result of not meeting Sheriff Durden on the scheduled date and time agreed upon, Sheriff Durden called my mother.

278. I did not meet with Durden at the agreed-upon time. Durden called my mother's number, looking for me. Sheriff Durden called 336-514-8751 from the CCSO phone number 336-694-9311 at 1:10 p.m. but didn't get Ms. Thaxton.

279. Then, at 1:37 p.m., Sheriff Durden called 336-514-8751 from his cell phone. His cell phone number used at the time of this Complaint registered to Sheriff Tony Durden, Jr., is 336-514-5124.

280. As Durden knows, I have an attorney who couldn't speak with me, but he attempted again, making me wonder why K. Farrish still had to be held for a crime for which the CCSO has no proof he was involved.

281. His fingerprints were not found on any weapon, and there was no gun residue- he wasn't tested even though he was detained, as they stated they were looking for an active shooter.

282. Today, August 25, 2023, Farrish is still on the home monitor device without an explanation. His fingerprints were not found on anything, and he was one of the persons detained on the night of this incident.

283. As of August 22, 2023, Farrish was told in court he would remain on house arrest until his next court appearance in February 2024.

284. The persons involved in this incident have already been arrested, charged, bonded, and waiting to appear in court. A metal safe (not listed in SW) was taken from the seizure, along with anything dealing with a firearm, bullets, holsters, etc., including the search warrant. CCSO was able to recover two handguns from the metal safe that were not listed as an item on the search warrant.

285. This was discovered after the safe was removed. Neither my brother nor my fingerprints were found on either weapon, and it was then discovered that one of the guns had been stolen from Burlington.

29

286.  As I stated above, during Farrish's court appearance in March, Durden said, "I know that you didn't have anything to do with this, but we charged you with it because you live there." This was the statement stated by Sheriff Tony Durden of CCSO.

287.  Deputies searching for information about an attempted murder suspect in Caswell Co. The Caswell County Sheriff's Office is looking for the person or people responsible for firing shots into a home on Mineral Springs Road. On January 23, 2023, the Caswell County Sheriff's Office responded to a call of shots fired into an occupied dwelling on Mineral Springs Road in the Pelham community. If anyone has any information on this incident, you are asked to contact the Sheriff's Office at 336-694-2555 or Caswell County Crime Stopper at 336-694-5199.

288.  Shooting Suspect Arrested: Person County Sheriff's Office- Roxboro, NC. Aaron Tsaddio Ward was served with a Caswell County FELONY WARRANT FOR ARREST, charging him with (1) count of DISCHARGING A WEAPON INTO OCCUPIED PROPERTY. He was released from Person County Detention Center after posting a $25,000.00 SECURED BOND. His first appearance in Caswell District Court is scheduled for Wednesday, March 15th, 2023, at 9:00 am.

289.  Shooting Suspect Arrested: Caswell County Sheriff's Office arrested and charged Yanceyville Township NC resident Immanuel Xavier Anderson with the commission of the following FELONIOUS criminal offenses: (1) count of DISCHARGING A WEAPON INTO OCCUPIED PROPERTY. He was released from the Caswell County Detention Center after posting a substantial $20,000.00 SECURED BOND. His first appearance in Caswell Superior Court is scheduled for Monday, March 13th, 2023, at 9:00 am

290.  Shooting Suspect Arrested: Caswell County Sheriff's Office arrested and charged Reidsville, NC resident Jomonica Lenaye Thomas with the commission of the following FELONIOUS criminal offenses: (1) count of DISCHARGING A WEAPON INTO AN OCCUPIED DWELLING. She was released from the Caswell County Detention Center after posting a $10,000.00 SECURED BOND. Her first appearance in Caswell Superior Court is scheduled for Wednesday, April 5, 2023, at 9:00 am.

291.  Shooting Suspect Arrested: Person County Sheriff's Office- Roxboro, NC. Aaron Tsaddio Ward; Shooting Suspect Arrested Immanuel Xavier Anderson; and Shooting Suspect Arrested: Jomonica Lenaye Thomas were arrested and charged with line number 287. Line numbers 287-290 were published via the CCSO website, providing information to the public in regards to the January 23, 2023, shooting on Mineral Springs Road, Pelham, NC 27311.

**SEVENTH CAUSE OF ACTION:**

Plaintiff repeats, re-alleges, and re-asserts each allegation outlined in the preceding paragraphs as if fully set forth herein.

292. Police misconduct involves unethical and unlawful activities by law enforcement officials, including excessive force and unreasonable searches and seizures.

293. Reputation of the involved officers: An officer's history of police misconduct and other government officials—violates the plaintiff's constitutional rights. Police Misconduct and Civil Rights Violations—Police swore to serve and protect the community.

294. Wrongful Search and Seizure: CCSO deputies interrogated and searched the Thaxtons based on "reasonable suspicion" and unfairly targeted the Thaxtons, which made this search and seizure unconstitutional. Plaintiffs are protected from wrongful search and seizure by the Fourth Amendment. However, CCSO overstepped its bounds.

295. Unlawful Arrests: CCSO arrested the Thaxtons based on "reasonable suspicion." After the information and details surrounding the matter, the Thaxtons
were victims of illegal arrests without legal grounds. The plaintiff states this has occurred due to unfair profiling and abuse of power. Unlawful arrests can ruin people's lives.

296. CCSO arrested the Thaxtons based on "reasonable suspicion." After the information and details surrounding the matter, the Thaxtons were victims of unlawful arrests without legal grounds and malicious prosecution. The plaintiff states this has occurred due to unfair profiling and abuse of power.

297. The Thaxtons are entitled to Freedom of speech, religion, and assembly; freedom from discrimination; the right to procedural due process; and the right to petition the government.

298. CCSO's Major Otis Foster witnessed CCSO's Sheriff Durden violating the civil rights belonging to Ms. Britt on January 24, 2023, when she contacted the CCSO regarding her children, Tylan and Talaisha Thaxton. Major O. Foster failed to prevent or stop this violation from occurring.

299. Police misconduct settlements have a history of being substantial. These claims have four essential components: initiating a criminal legal proceeding without probable cause, with malice, and a judgment in favor of the victim. We ask the courts to make a settlement, including stipulated reforms on how police warrants are handled.

300. Before Tylan and Talaisha Thaxton's arrest, Tylan's first encounter with the CCSO was in March 2012. While Talaisha Thaxton has not had an encounter with the CCSO, other community citizens have observed the exact behavior of the CCSO.

301. The defendants' CCSO policies described above indicate that they have engaged in a pattern and practice of Constitutional and Civil Rights law violations at the Caswell County Sheriff's Office.

302. With a direct and proximate result of the aforesaid constitutional violations, civil rights violations, and misconduct of Defendants, jointly and severally, the Plaintiff has sustained damages in an amount over Two-Hundred Fifty Thousand and No/100 Dollars ($250,000.00), ($75,000 per plaintiff), including for pain and suffering of Tylan and Talaisha Thaxton, and Latoye Britt before their arrest and all misconduct of CCSO Law Enforcement.

303. Defendants' acts and omissions were the legal and proximate cause of violations of Tylan Thaxton and Talaisha Thaxton's Federal and State Constitutional Rights.

304. At all relevant times, Defendants CCSO were acting under color of State law, had in effect express or de facto policies, practices, procedures, and customs that were a direct and proximate cause of the wrongful, unconstitutional, and unlawful conduct of CCSO officers and other law officials involved worked at Caswell County Sheriff Office.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs Tylan Thaxton, Talaiaha Thaxton, and Latoye Britt pray the Court to enter a judgment and award against Defendants, jointly and severally, as follows: practices complained of herein are unlawful under the United States Constitution and the North Carolina Constitution;

That Plaintiff has and recover of the Defendants, jointly and severally, compensatory damages in an amount over SeventyFive Thousand and No/100 Dollars ($75,000.00) for damages, together with interest at the legal rate; pray the Court to enter a judgment and award against Defendants, jointly and severally, as follows:

1. Respectfully asks that the Court enter judgment in favor of the plaintiff and against the defendants for the plaintiff's emotional distress, public humiliation, loss of reputation, confined and false imprisonment, discrimination, and other compensatory damages in the amount to be determined by a jury and interest as determined by the Court;

2.      Respectfully asks that the cost of this action be taxed against the defendants and with any other filing fees regarding the Complaint;

3.      Respectfully asks that the Court enter judgment in favor of the plaintiff and against the defendants for punitive damages in an amount to be determined by a jury;

4.      Respectfully asks that the Court grant the plaintiffs trial by a jury and

5.      Respectfully ask that immediate relief be taken into consideration for the plaintiff's inability to obtain gainful employment with consideration of record expungement;

6.      Respectfully asks that the Court consider granting the plaintiffs immediate relief. The plaintiff asks for such relief due to the pending charges hindering the plaintiffs from moving forward with their lives.

7.      Respectfully asks that the Court consider granting the plaintiffs access to receive additional education, including but not limited to admission, books,  and tuition fees, as this Court deems necessary that is just and proper.

8.      Respectfully that such other and further legal documents filings and equitable relief as this Court deems necessary that is just and proper.


This is the 13th day of June 2024

                                        Tylan D. Thaxton
                                        Talaisha D. Thaxton

              BY:_____

              BY:_____

                                        Tylan D. Thaxton
                                        Talaisha D. Thaxton
                                        691 Mineral Springs Road
                                        Pelham, NC 27311
                                        743-254-9034
                                        latoyebritt76@gmail.com

33